UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:23-cr-161 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| REGINALD WIMBERLY, JR., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

On December 3 and December 4, 2024, the Court held a hearing pursuant to 18 U.S.C. §§ 4241(c) and 4247(d) to assess Defendant Reginald Wimberly, Jr.'s ("Wimberly") competency to stand trial in this case. For the reasons stated herein, the Court finds Wimberly competent to proceed, and this matter will be set for trial.

I. BACKGROUND

On March 23, 2023, Wimberly was indicted for robbery, in violation of 18 U.S.C. § 1951(a). (Doc. 17.) He was arraigned and detained on April 5, 2023. Wimberly moved for a competency evaluation and hearing. (Doc. 20.) The government did not oppose (Doc. 21), and the motion was granted (Doc. 22). A custodial psychological evaluation was conducted by Dr. Kristin Conlon at the Metropolitan Correctional Center in Chicago, Illinois ("MCC Chicago"). (Doc. 28.) Dr. Conlon concluded that Wimberly was competent to proceed. (*Id.*) Wimberly requested an independent forensic examination, this time with Dr. Ryan Mekota. Again, the government did not object, and the motion was granted. Dr. Ryan Mekota concluded that Wimberly was not competent but could be restored with education. (Doc. 38.)

The competency hearing began on December 3, 2024, and concluded on December 4, 2024. Both Dr. Conlon and Dr. Mekota testified. The Court heard argument from counsel

before stating its own observations of Wimberly and taking the matter of competency under advisement.

### A. Dr. Conlon's Findings and Opinion

Dr. Conlon is a forensic psychologist for the Bureau of Prisons ("BOP"). (Doc. 28 at 80.) After working for six years as a clinical psychologist in a state hospital, she joined the BOP as a staff psychologist in 2018. In 2021, she became one of the BOP's forensic examiners. Since then, she has conducted 75 forensic evaluations.

Dr. Conlon conducted Wimberly's forensic evaluation. (*Id.*) She had six separate one-on-one meetings with Wimberly. These meetings varied in length because, as she explained, Wimberly was not consistently willing to participate. Dr. Conlon spent a combined total of approximately four hours in these meetings with Wimberly. Dr. Conlon's examination included reviewing Wimberly's medical records, the Indictment, the motion and Order for a competency evaluation, BOP security (SENTRY) reports along with Psychology Data System (PDS) records, BOP electronic medical records, and a sampling of monitored telephone calls Wimberly placed from MCC Chicago. (*Id.* at 82.) Additionally, Dr. Conlon interviewed BOP staff who observed or interacted with Wimberly while he was assigned to MCC Chicago. (*Id.*) Dr. Conlon also observed Wimberly when she was in the unit to which he was assigned. (*Id.*) These observations typically occurred without Wimberly's awareness that she was in the unit. Finally, Dr. Conlon communicated directly with the assigned prosecutor and Wimberly's defense counsel. (*Id.*)

To reach her conclusions, Dr. Conlon was further aided by mental status examinations and the Revised Competency Assessment Instrument (RCAI). (*Id.*) Dr. Conlon testified the mental status examinations included assessments of orientation, focus, memory, responsiveness to internal stimuli, and clinical interviews. The RCAI is a semi-structured interview process

using a series of questions tailored to assessing a defendant's factional and rational competency. (*Id.* at 93.) Dr. Conlon testified the RCAI was developed by a former BOP examiner. The RCAI questions were posed to Wimberly over four meetings in a private office. (*Id.* at 93–94.)

In reviewing Wimberly's prior medical records, Dr. Conlon was aware of prior diagnoses for, among other things, schizophrenia, antisocial personality disorder, and hallucinations. (*Id.* at 84–86.) She testified that prior diagnoses do not mean that a person will present in the same way years later. Moreover, she explained that a history of mental health diagnoses or a present mental health concern are not, on their own, determinative of competency. To her, a proper evaluation must assess the severity of any present symptoms and whether those symptoms impair competency.

Dr. Conlon testified to observing no indications that Wimberly responded to internal stimuli. (*Id.* at 92.) Wimberly could be irritable, frustrated, and impatient with her questions, sometimes even directing her to find the information she sought from his medical records. He would roll his eyes, sigh, and try to redirect conversation by telling Dr. Conlon to move to another topic. (*Id.* at 87.) He was most engaged when discussing the timeline of his detention and his prospects for leaving the institution. To Dr. Conlon, his engagement in the evaluation process was inconsistent and oftentimes motivated by steering the conversation to topics of priority to him. (*Id.* at 93–94.) Dr. Conlon explained that Wimberly could be focused and be attentive when he chose to be, and this observation was an indicator that he could orient himself to his surroundings and engage properly when it suited his interests. (*Id.* at 88.)

She further testified to having no concern Wimberly could sustain his attention. (*Id.* at 87.) He was oriented to time and place. (*Id.*) He maintained proper hygiene, while showing no signs he needed assistance with daily tasks or activities. (*Id.*) Wimberly understood the various

departments in the facility, could contact others for assistance as appropriate, and demonstrated an ability to advocate for his own needs. (*Id.*) He directed her to pertinent information in medical records. He also directed a third party on the steps he undertook to evade telephone security protocols in exchange for commissary funds, even remaining calm when the third party asked repeatedly for clarification. (*Id.* at 89.)

Dr. Conlon acknowledged that her evaluation was somewhat impeded by Wimberly's lack of sustained participation. (*Id.* at 93.) She also acknowledged that Wimberly may be lower functioning, but again this could not be fully assessed because he refused consent to his school records and did not fully engage in the examination process.[1] As she testified, this did not, however, prevent Dr. Conlon from determining that Wimberly understands his present legal circumstances and the need to assist his counsel. (*Id.* at 94.) Wimberly properly stated and defined the charges against him, the role of his counsel and the Court, that verdicts of guilty or not guilty will result from a trial in this matter, the possible defense of guilty by reason of insanity, and the definition of a plea agreement. (*Id.* at 94–95.) In discussing his charges and criminal proceedings generally, Dr. Conlon testified that Wimberly was rational and coherent. (*Id.*) When terms were provided to him, like "appeal," Wimberly retained the information and restated the definition in a proper but alternative way, that being to define an appeal as a "challenge" to a verdict. (*Id.* at 95.) Wimberly also acknowledged and understood the need to assist his counsel, although Dr. Conlon recognized such assistance may be limited by Wimberly's willingness to do so.

---

[1] Efforts to assess education records were thwarted by Wimberly's refusal to consent to Dr. Conlon reviewing such records. (*Id.* at 89.) Wimberly explained his refusal to her as an effort to prevent too much information being available to her or the Court.

In sum, Dr. Conlon concluded Wimberly was not suffering from any mental disease or defect that resulted in functional impairment. Wimberly has the requisite understanding and rational abilities to assess his current legal situation and assist his counsel. As stated in her report and then testified to during the hearing, Dr. Conlon's opinion is that Wimberly is competent to proceed in this matter.

**B.      Dr. Mekota's Findings and Opinion**

Dr. Mekota is board-certified clinical psychologist. He has practiced clinical psychology for 10 years and owns his own practice. Dr. Mekota has performed 20 to 30 forensic examinations, most of them in relation to criminal matters. Like Dr. Conlon, Dr. Mekota testified his evaluations include obtaining background information about the subject and a semi-structured interview involving the assessment of broad factors to gain a specific understanding of the defendant's case. When appropriate, Dr. Mekota will conduct psychological and standardized testing.

Dr. Mekota met with Wimberly on one day for approximately four and one-half to five hours. A portion of this time was spent administering the Weschler Abbreviated Scale of Intelligence (WASI-II) and the Wide Range Achievement Test – Fourth Edition (WRAT4). (Doc. 38 at 124.) In his report, Dr. Mekota noted that testing was planned but not administered due, in part, to Wimberly's low language skills and "apparent test fatigue." (*Id.*) In addition to the results of these tests and Dr. Mekota's own observations, he considered the Indictment and Dr. Conlon's Forensic Report. (*Id.* at 124–25.)

After making note of Wimberly's physical appearance, Dr. Mekota observed Wimberly's expressive speech to be normal while his receptive speech seemed disconnected and confusing. (*Id.* at 125.) Efforts to obtain clarification, particularly with respect to certain aspects of Wimberly's personal life, were unsuccessful. Dr. Mekota concluded that Wimberly was a "poor

historian" with "vague and concrete" thought processes. (*Id.* at 126.) Like Wimberly's responses to Dr. Conlon, Dr. Mekota noted, among other things, that Wimberly understood the charges against him, including being charged with more serious felony offenses; that he was being prosecuted in federal court and his options at present were to plead guilty or not guilty; plea negotiations can result in less time; understanding he could be waiving appellate rights if he pleaded guilty; the role of the jury; and what it could mean to testify in his own defense. (*Id.* at 128–29.) However, Dr. Mekota also observed instances of Wimberly's confusion, particularly as it related to the role of the defendant, how cases can be brought in federal court, probation, and, before correcting himself, the role of defense counsel. (*Id.*)

Also, like Wimberly's interactions with Dr. Conlon, Dr. Mekota observed that Wimberly could retain new information, particularly as it related to the role of the defendant and testimonial evidence. (*Id.* at 129.)

The WASI-II assessment of intellectual functioning resulted in a score of 67, which is in the first percentile. (*Id.* at 130.) Verbal comprehension scored at 68, and perceptual reasoning scored at 70. (*Id.* at 130–31.) The WRAT for word reading demonstrated mastery at a second-grade level. (*Id.* at 131.)

In his report, Dr. Mekota explained that Wimberly can present as someone who possess "adequate cognitive ability to function appropriately at an independent level without support" but that testing and observations exposed greater impairments. (*Id.* at 132.) This opinion was based, in part, on Wimberly's testing results as well as Wimberly's inability to provide background information, to consistently retain new concepts, and confusion. Dr. Mekota also noted the absence of standardized testing by the BOP as well as Wimberly's stated belief he could represent himself better than his assigned counsel. (*Id.* at 132–33.) In conclusion, Dr. Mekota's

opinion is that Wimberly is incapable of understanding the nature and objective of the proceedings against him and is unable to assist in his defense. (*Id.* at 133.) Dr. Mekota concluded by stating "restoration may be achieved via structured, comprehensive education," but when asked to explain this statement to the Court Dr. Mekota was unable to do so. (*Id.*)

**II.     ANALYSIS**

When there is reasonable cause to believe that a defendant may be "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense," the court must order a competency hearing. 18 U.S.C. §§ 4241(a), (b). To aid in its review, the Court may also order a competency evaluation. § 4241(b).

A defendant is competent if he has "(1) a 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding,' and (2) 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Dubrule*, 822 F.3d 866, 875 (6th Cir. 2016) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)). A defendant who "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975).

"[T]he bar for incompetency is high." *United States v. Miller*, 531 F.3d 340, 350 (6th Cir. 2008); *United States v. Hood*, 827 F. App'x 524, 529 (6th Cir. 2020). To find incompetence, the defendant must exhibit "a 'deep[] breakdown in cognition'" rendering him unable to understand the proceedings or assist in his defense. *Hood*, 827 F. App'x at 529 (quoting *United States v. Tucci-Jarraf*, 939 F.3d 790, 795 (6th Cir. 2019)); *see also United States v. Coleman*, 871 F.3d 470, 477 (6th Cir. 2017).

"There are [] no fixed or immutable signs of incompetence." *Cowans v. Bagley*, 639 F.3d 241, 247 (6th Cir. 2011) (quoting *Drope*, 420 U.S. at 180). Relevant evidence is any evidence probative of competency and can include such things as defendant's behavior, courtroom demeanor, medical records, and medical history. How a defendant conducts himself in the courtroom, how he is observed to interact with defense counsel, and defense counsel's stated observations of a defendant's out-of-court demeanor should also be considered. "[A]ny evidence that is probative of a defendant's ability to understand the proceedings against him and to assist in his defense is relevant to the Court's competency determination." *United States v. Wilson*, No. 16-20460, 2022 WL 3044634, 2022 U.S. Dist. LEXIS 137109, *33 (E.D. Mich. Aug. 2, 2022) (quoting *United States v. Stafford*, No. 12-cr-238, 2013 WL 1694033, 2013 U.S. Dist. LEXIS 55657, *2 (N.D. Ohio Apr. 18, 2013)). Each competency hearing should be "tailored to the individualized circumstances of the particular defendant." *Hood*, 827 F. App'x at 529 (quoting *Indiana v. Edwards*, 554 U.S. 164, 177 (2008)).

Evidence that a defendant has limited intellectual functioning is probative but not determinative. The terms "intellectual disability" and "incompetent" are not interchangeable. *Wilson*, 2022 U.S. Dist. LEXIS 137109, *33 (citing *Davis v. Kelley*, 854 F.3d 967, 971 (8th Cir. 2017)). That is because intellectually disabled defendants may still be sufficiently able to understand the proceedings against them and assist in their own defense. *United States v. Pruitt*, 429 F. App'x 155, 158 (3d Cir. 2011).

When, like here, a court confronts opposing expert positions, the court should consider the length of the evaluation periods, the thoroughness of the examiner's observations, and the expert's credentials and experience in evaluating competency. *United States v. Evans*, No. 20-127, 2021 WL 1852943, 2021 U.S. Dist. LEXIS 88738, *9 (E.D. Ky. May 10, 2021) (citing

*Dubrule*, 822 F.3d at 877). It is with these considerations in mind that the Court concludes Dr. Conlon's testimony and opinion is entitled to greater evidentiary weight.

While similarly credentialed, Dr. Conlon has conducted 75 forensic examinations to Dr. Mekota's approximately "20 to 30." Dr. Conlon's examination involved multiple, one-on-one interactions on different days. Dr. Mekota's observations were limited to a single four-plus hour interaction. Dr. Conlon personally observed Wimberly's interactions with others when Wimberly was unaware of her presence in the unit, and she interview MCC Chicago staff who similarly observed Wimberly engaged in social interactions and daily tasks. Dr. Mekota testified that his only observation beyond his meeting with Wimberly was when Wimberly was escorted to and from the interview room by a corrections officer. Finally, Dr. Conlon obtained recorded calls Wimberly placed to others from the facility that revealed multi-step rationalizing and directions. Dr. Mekota's examination did not include such information. In sum, Dr. Conlon's examination was the result of collecting information from multiple sources over a lengthier period of time.

The Court also considers its own observations. The Court heard from the government's witness on the first day of the hearing and from defendant's witness on the second. Wimberly was in court for the entirety of these proceedings, so for approximately six and a half hours. He remained focused, attentive, calm, and appropriately engaged with his counsel. Indeed, during his counsel's cross-examination of Dr. Conlon, certain instances of misconduct during Wimberly's teenage years were raised. Wimberly did not appear pleased with these questions. As the Court noted, Wimberly made a dissatisfied facial expression, turned to his counsel, turned back to the Court, and returned his focus to Dr. Conlon. To the Court, this demonstrated Wimberly's understanding of and attention to the questions being asked. It also demonstrated

his ability to remain calm in the face of probing questions and the ability to conduct himself properly in a courtroom setting.

Defense counsel shared his observations and concerns, chief among them being that Wimberly is difficult to deal with because Wimberly talks over people and insists on the topics to be discussed. Dr. Conlon observed similar behavior and rendered an opinion that such insistence was consistent with antisocial personality disorder, and also volitional—meaning he chooses his topics but can, when he desires, focus on matters of import to these proceedings. Dr. Mekota concluded this behavior rendered him incompetent. Importantly, however, Dr. Mekota did not challenge the behavior itself. On cross-examination he acknowledged that Wimberly "was not always choosing to omit" information when responding to questioning. From this, the Court concludes that both Dr. Conlon and Dr. Mekota observed Wimberly decide when to engage and the amount of detail to provide.

Again, the Court credits Dr. Conlon's conclusion that Wimberly was *able* to consult with counsel and understand the proceedings. The Court's competency determination focuses on Wimberly's abilities, not his choices. *Dubrule*, 822 F.3d at 877 (first citing *Dusky*, 362 U.S. at 402 then citing *Miller*, 531 F.3d at 349). After considering the record evidence and arguments of counsel, the Court finds Wimberly more likely than not to have a rational understanding of the proceedings and is also able to assist counsel in his defense.

### III.  CONCLUSION

For the reasons stated above, the Court finds Wimberly competent to proceed.

**IT IS SO ORDERED.**

Date: December 30, 2024

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE